case number 21-7018. Dana Marie Bernhardt, personally and as the administratrix of the estate of Jeremy Wise et al., appellants, versus Islamic Republic of Iran et al. Mr. Singer for the appellants, Mr. Pincus for the appellees. Good morning and may it please the court. Randy Singer on behalf of the appellants, the families of two special ops contractors who were killed guarding a CIA base in Afghanistan by a suicide bomb. The Justice Against Sponsors of Terrorism Act, JASTA, was passed in 2016 with the express purpose of providing litigants with the broadest possible basis to seek relief against those who have provided material support, directly or indirectly, to foreign terrorist organizations. We're here because the court below narrowed the scope of that act in direct contravention of that purpose in three important ways. First, as a threshold matter, the court required a causal link between the forum-directed activities and the injuries, and that's contrary to a subsequently decided Supreme Court case, the Ford Motor Company case. Second, with regard to the aiding and abetting count, the court applied a specific intent standard, even though this court's Halberstam analysis only requires that the defendants be generally aware of their role in an illegal or tortious activity. And third, in analyzing the Halberstam factors under the aiding and abetting count and in the conspiracy count, the court looked only to direct links between the defendants and the terrorists who committed the act, as opposed to the indirect links that JASTA was designed to facilitate. I'd like to spend my time today looking at the issue in our brief. Of course, I'll answer any questions that the court has on that. On aiding and abetting, the court took this case away from the jury at the motion-to-dismiss stage, and Judge Kelly found that the plaintiff's allegations that the HSBC defendants should have known about the Iranian bank's connections to terrorism because of well-known public information was insufficient to establish that they were generally aware of their role in terrorism. That's applying a specific intent standard for the banks when the Halberstam analysis only requires they be generally aware of their role in an illegal or tortious activity, and that acts of terrorism could be reasonably foreseeable as a result of that. Unlike other cases, such as the Siegel case in the Second Circuit, where HSBC defendants were dealing with just al-Raji Bank, in this case we have pled that they were also dealing with Saderat and Melli, who were Iranian banks who themselves were sanctioned because of their support of terrorism. Can you answer this question for me, counsel? Is it your position that all that is required is that the defendant be generally aware that they are supporting terrorist activity, or do they have to be generally aware that they are doing business with someone who supports al-Qaeda, and then al-Qaeda, someone who is linked with al-Qaeda, commits the terrorist act? I ask that question because it seems like it's a much broader rule if you're in, and I don't know that that's consistent with the statute, to say that, well, if you know that someone is linked to terrorism, and then there's any terrorist act that occurs somewhere in the world, and you had no idea that this entity was linked to that particular terrorist group, that the defendant should still be liable? Judge Wilkins, I think that's a qualitative analysis. It has to be made based on those that we have pled links to al-Qaeda, and you know the first Halberstam factor under substantial assistance is the nature of the act, and in this case, as your honor has pointed out, it's not just a general terrorism act. It's an act by al-Qaeda that was hatched in northwest Pakistan, which is a training ground that was supported by and facilitated by Iran. Al-Rajhi Bank is connected to al-Qaeda. Both Bank Sadrat and Bank Mali have been sanctioned for supporting terrorists, and the attack that is at issue in this case is the kind of sophisticated, complex attack that requires the kind of financing that we've alleged has occurred as a result of what the HSBC defendants did. I guess my point is there's a difference between alleging that there are all of these links between these entities and al-Qaeda, and we can accept all of that, but that's different than alleging that the defendants here knew or should have known of those particular links. That's what I'm trying to understand, kind of how you think the legal rule works there. Yes, your honor, we think we fall on the... we think we have pled what is necessary even for the narrowest legal rule that your honor just articulated, but we think that the law allows for a broader rule than that. But the facts in this case are that Sadrat and Bank Mali, it's not just publicly available information linking them to terrorists. They have been designated by the State Department as specially designated nationals, meaning that they promoted terrorism. That's why HSBC wasn't supposed to be with them. And with regard to El Raji Bank, HSBC's own due diligence database said that their senior management was connected, excuse me, not just to terrorists, but to al-Qaeda. And so, your honor, we do believe in this case that we fit even the narrower ruling of links to al-Qaeda and not just links to terrorism generally. But if we go back to the Halberstam case, I think we see where the line falls, because in Halberstam, Linda Hamilton didn't know that her live-in lover was even doing burglaries, much less that there was going to be a murder. But what the court said was that she knew something was afoot. She knew something illegal was afoot because there's all this money that's being made, and her turning a blind eye to it and not asking questions was enough for her to be held liable for aiding and abetting that murder. So that's why we believe that the broader legal rules should apply. But, your honor, we think our pleading fits under even the narrower rule. If we accept your broader formulation of the rule, as you're calling it, would that create a circuit split with the Second Circuit? I don't believe it would under Kaplan, your honor, because even though what I'm saying is the broader rule, you have to be within those riverbanks of the broader rule, but you still have to apply the other Halberstam factors, and that's why it's kind of an overall qualitative analysis. So if we look at the Kaplan decision in the Second Circuit, one of the things they said was that these weren't routine banking services. The appellees say in their brief that these are routine banking services, but they weren't. They were violating a sanctions scheme designed to prevent terrorism. That's one thing. The second thing that happened in Kaplan in the Second Circuit was, even though there was a UN report linking the Lebanese Canadian bank customers to Hamas, they continued, they pooh-poohed that report. They said that's just propaganda, and they continued to do business with them, and that's essentially what happened here with HSBC and al-Rajhi Bank. Despite these public reports, despite their own database saying we should stop doing business with them, despite the fact they stopped doing business for a year, then they started back up in 2006 doing business with al-Rajhi Bank and did business all the way through the Kaplan case in the Second Circuit. It is distinguishable from the Siegel case, which didn't involve sanctioned banks like the Iranian banks, and therefore we think if you were to send this back and in reverse, it would be very consistent with the Second Circuit's ruling in Kaplan and in Siegel. So you think that the facts are distinguishable? We do think the facts, yes, Your Honor, because in Siegel, it was HSBC defendants, but in Siegel, the only allegations were with regard to al-Rajhi Bank, and in Siegel, what the court said was most important in Kaplan, when it distinguished Siegel, the court said what's most important is that HSBC stopped doing business with al-Rajhi Bank 10 months before the attacks that were at issue in Siegel. But then what happened is, after the attacks at issue in Siegel, they started doing business with al-Rajhi Bank again and did a billion dollars of bank note business with al-Rajhi Bank before our attack. And so we think that the facts are distinguishable from Siegel, and we think that the court's ruling, if it were to reverse, would be entirely consistent with the Second Circuit. Your Honor, the other main issue with regard to the District Court's opinion is that when the District Court analyzed the Halberstadt factors, it only looked at direct connections between the defendants and the terrorist group al-Qaeda or Balawi, and that's just inconsistent with the purpose of JASTA. The Anti-Terrorism Act was amended by JASTA to allow for the kind of indirect liability that we're advocating for today. And so we believe that if you look at the allegations in the complaint under the standards of JASTA as it amended the Anti-Terrorism Act, that we fit well within the parameters of that based on the amount, 10 years they were doing this, HSBC was doing this, the amount up to $19 billion, the time and the nature of the terrorist attack and the state of mind of HSBC. Your Honor, I see that my time is up. I'm happy to answer any of the questions, but I'll save the rest for rebuttal. Judge Randolph, Judge Rao? No. All right, we'll give you some time on rebuttal. We'll hear from counsel for HSBC. Thank you, Your Honor, and may it please the Court. Defendants abhor the terrorist acts that injured plaintiffs, but the complaint here fails to allege facts permitting plausible inferences of any of the elements of either aiding and abetting or conspiracy liability under JASTA. And let me start with Judge Rao's question about a conflict with the Second Circuit. We think reversing here would create a conflict because this case is really indistinguishable from the Second Circuit's decision in Siegel. Siegel, as my friend on the other side acknowledged, involved the very same allegations about clearing transactions, dollar clearing transactions with Kaplan case in which it held that the complaint was sufficient in distinguishing Siegel where the dismissal of the complaint was upheld. It said, and I'm quoting from page 862, there are conspicuous differences between this case and Siegel as to the customers that were served by their respective banks. In Siegel, HSBC's relevant customer was another bank, ARB, Saudi Arabia's largest bank with vast worldwide operations. And ending the quote, the Court went on to say that in Kaplan, the defendant directly banked as its customers, the alleged terrorists or terrorist fronts. So what the Second Circuit has done is drawn a distinction between clearing transactions for other banks that have legitimate functions and cases where the allegation is the customer was a terrorist. Right. So, but Mr. Pincus, so here at least Bank Saderat was a specially designated global terrorist group, right? So it's not just Al-Raji Bank, which doesn't have that designation. I mean, here, you know, the United States government has designated that bank as one, you know, that poses a significant risk of, you know, doing financial transactions with organizations that are, have committed or are expected to commit terrorist acts. I mean, isn't that a more direct connection? I don't think so, Your Honor, because what, it still was a bank with legitimate functions. And courts have said even dealings with Iran itself, and the allegation here is that the banks were controlled, those two banks were controlled by Iran, is distinguishable because governments, even Iran, have legitimate functions. And so I think the distinction here, these banks fit into the same category as Al-Raji Bank. It's the distinction that this, that this drew a distinction between dealing, the bank dealing with Iran, which is a government with legitimate functions. So I think here, these banks are in the same situation and therefore fall into the same category. Yeah, they may, you know, well have some legitimate functions, but the U.S. government has said we are going to place sanctions on them because of their terrorist affiliations. And then if HSBC helps them to evade those sanctions, I mean, isn't there, isn't there a connection there? Is that connection not sufficient for at least aiding and abetting liability, if not? I don't think so, Your Honor. I don't think that's, the standard here is with HSBC generally aware that it was assuming a role in terrorist activities. And I think to meet that high standard, which is a high standard, I think, just dealing with a bank that has legitimate functions, but also may be involved in some legitimate activity, that's exactly the same allegation that's being made here in the complaint about Al-Raji Bank, that it was a bank that had legitimate functions, but that also was banking terrorist activities. And because Siegel found that wasn't enough for Al-Raji Bank, it shouldn't be enough either for these banks because it hasn't been found enough even for dealing with Iran itself in other cases. I'd like to address, if I could, Mr. Singer said, pointing to Halberstam, that all is required is an awareness of assuming a role in wrongful conduct from which terrorist acts are foreseeable. And I think that is inconsistent with the statutory language here. What the statute says is it imposes liability, and I quote, on a person who aids and abets by knowingly providing substantial assistance, and then deleting the words relating to conspiracy, such an act of international terrorism. So it expressly creates aiding and abetting liability for aiding and abetting international terrorism. Halberstam was different. It was talking about general aiding and abetting standards, and therefore said, as a general matter, aiding and abetting liability can attach for any foreseeable injury resulting from the wrongful act aided. But here Congress was very specific. It created a specific form of aiding and abetting liability. It didn't say there's liability for aiding and abetting any wrongdoing from which an act of international terrorism is foreseeable. It did not say that. It said aiding and abetting an act of international assuming a role in terrorist activities. Let me ask you this, Mr. Pincus. Suppose you have three people, and person one says to person two, you know, I'm really sick of my boss. He's been mean to me and didn't give me that raise. I'm going to shoot him. And knowing that person two says to person three, hey, let me borrow your gun because I want to give it to person one because he needs it to take care of his boss. And person three gives his gun to person two, and person two gives the gun to person one, and person one shoots and kills his boss. It sounds like me that you're arguing that person three can't be convicted of aiding and abetting liability on those facts. I don't think I am, your honor, because if we're talking about general awareness, person three certainly had awareness that he was by giving the gun to person two who said he was going to give it to person one to commit the murder. I think the person three, unless I'm misunderstanding your hypothetical, would have the requisite general awareness. You're saying that the statute says you've got to directly aid the principal? No, I'm making a different argument, your honor. I'm not saying that neither we nor Judge Kelly said there had to be direct aid. What I'm saying here is that the awareness has to be awareness of assuming a role in terrorism. My friend on the other side has said that the awareness just has to be awareness of any wrongdoing from which a terrorist act is foreseeable, and we think that is not consistent with the statutory language. That doesn't have to do with directness, which is a different question. Where directness comes in, and I think my friend is wrong that Judge Kelly applied a directness standard, is one of the six substantial assistance factors is how direct the relation to the principal, how direct the aid is. One of those six questions does ask that, and here it's quite indirect. That indirectness, as one of those six factors in your example, could weigh against finding aiding and abetting liability, finding substantial assistance, depending on the other factors. Here, we think all of the factors weigh very strongly against finding substantial assistance, that the nature of the act encouraged here at most, as Siegel said, the act encouraged was not terrorism. It was assisting in the regulatory violations. The amount of assistance, as Siegel said, put a low weight on that, because as in Siegel, as here, there's no allegation that any of the money actually went to a terrorist group. There's no allegation of that in this complaint. Third factor, presence or absence at the site of the wrongdoing. Again, none of the HSBC defendants were present at the terrorist acts. Relation to the principal, as I've said, here, there is no extended chain. HSBC to the Iranian bank, to their customers, to the Iranian government, to Al-Qaeda, quite an extended chain. The Second Circuit in the Honigman case, which came after Siegel, said, and I'm quoting from page 501 of that opinion, said that the relation, quote, should not be so attenuated, as in Siegel, I'm picking up the quote again, where a commercial relationship with another bank that was linked to various terrorist organizations, including the that caused the plaintiff's injury. So the Second Circuit has said, critical here, that there's that extended relationship. State of mind, the defendant wasn't of one mind with the wrongdoer. Again, Judge Kelly didn't require specific intent, but in applying this factor, he said, there wasn't that intent, and that weighs against finding substantial assistance. And then there's duration. The duration of the relationship was long, but again, as the Second Circuit pointed out in Siegel, there's no allegation that any of the money actually went to the terrorist groups. And so that weighs against that factor. So I think if you look at all of those factors, there's a very strong argument that these cases aren't compatible. And just to anticipate one other statutory argument that my friend may make, and that's made in the briefs, is pointing to the purpose findings and purpose flaws of the court. I think it's important for the court to look specifically at the language, because if the court looks at 2A, 6, and 7 of the findings, I think you'll find that that directly and indirectly language in 7 relates to personal jurisdiction. Congress was concerned about the scope of personal jurisdiction. And so after saying Halberstam is the substantive test, it had some findings related specifically to specific jurisdiction. And then the purpose clause talks about the purpose of the act providing civil litigants with the broadest possible basis consistent with the Constitution of the United States to seek relief against persons, et cetera, et cetera. So we think it's quite clear that that purpose doesn't override Halberstam or the statutory language, but is focused on Congress wanting to be sure that the courts of the United States were open to the greatest extent possible, given that a lot of these defendants would be found outside the United States. I see I'm over my time, unless the court has any further questions. Judge Rao, Judge Randall? No. All right. Thank you, counsel. Did counsel Fort Pellant have any time remaining? They did not, Judge. All right. We'll give you two minutes for rebuttal, sir. Thank you, Your Honor. The et cetera, et cetera that my friend just mentioned, it goes on to say directly or indirectly supporting terrorists. And I think that's really what this case is boiling down to. If you look at the opinion below, my friend said that the judge did not require direct support, but at joint appendix page 88, it says the plaintiffs do not allege that the HSBC defendants had any involvement in transactions that the banks performed directly for Al-Qaeda or others involved in the attacks. At page 89, Judge Kelly said the plaintiffs make no allegations that the HSBC defendants had any direct relationship with Al-Qaeda or Balawi. So at every factor, when Judge Kelly was analyzing the Halberstam factors, the judge looked only at direct involvement. In the statute, all of the transactions here were bank to bank. Isn't that correct? The transactions were, yes, Your Honor, bank to bank. And the difference between the transactions here and the transactions in Siegel, and that's why the Second Circuit Siegel and Kaplan opinions are so important, is because in Kaplan, the defendants made the same argument that the appellees are making here. These are commercial bank transactions, and therefore we can't be held liable for commercial bank transactions. But what the Second Circuit said- Under your theory, would it be so that any depositor in the Raji Bank is potentially liable under the statute? No, Your Honor, because under our theory, it's not just Al-Raji Bank in routine commercial transactions. It's violating sanctions designed to stop terrorism with the Iranian banks, who were themselves specially designated terrorists. That's what makes this different from the Siegel case. And the court in Kaplan distinguished the Siegel case as well. Its own distinguished the prior Siegel case saying, we never said that just because these are commercial transactions doesn't mean there's not liability. And the court said in Kaplan, what we have here is that the Lebanese bank in Kaplan violated international norms by giving these five customers preferential treatment. So the court said, these aren't routine commercial transactions that are going on here. And that's what we have in this case, Your Honor, is these are not routine commercial transactions. We keep hearing that phrase, but the fact is every time they dealt with Bank Melly and Bank Sadrat, they were violating U.S. and international sanctions laws. And to say that terrorism acts are not reasonably foreseeable when you're doing financial business with banks that have themselves been sanctioned because of their support of terrorist activities, we think at least that creates a jury issue and should not be dismissed on a motion to dismiss. Your Honor, I see that my time is up. I'm happy to answer any other questions the court may have. Judge Rao, Judge Randolph? No, I don't have anything. All right. Thank you, counsel. We'll take the matter under advisement.
judges: Wilkins, Rao, Randolph